## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                          |   |                        |
|--------------------------|---|------------------------|
|                          | : |                        |
| WALTER HOVATTER          | : |                        |
|                          | : |                        |
| v.                       | : | Civil No. CCB-03-2904  |
|                          | : |                        |
| LOGAN WIDDOWSON, et al.  | : |                        |
|                          | ...o0o... |                |

## <u>MEMORANDUM</u>

Now pending in this civil rights case is the defendants' motion for summary judgment.  The issues were fully briefed and a hearing was held on December 20, 2005. For the reasons stated below, the defendants' motion will be granted.

I. <u>Background</u>

On March 13, 1990, Charles Payne, Jr. ("Payne") was shot and killed at his home in Princess Anne, Maryland.  His wife, Deborah Payne ("Debbie"), subsequently told the police that she had discussed with her cousin, Kirk Jenkins ("Jenkins"), on numerous occasions, the idea of paying a third party to kill her husband. She also told police that in April 1990 Jenkins told her that he had in fact paid someone to kill her husband.

Around 1993, the investigation into Payne's murder began to focus on the plaintiff, Walter Hovatter ("Hovatter"), as the third party who had been paid to murder Payne. Hovatter claims that suspicion turned on him only after the murder investigation was assigned to defendant Corporal George Jacobs ("Jacobs"), a Maryland State Police officer.  According to Hovatter, Jacobs conducted an intentionally misleading investigation, under the direction of State's Attorney for

Somerset County Logan Widdowson ("Widdowson"), by falsifying witness statements, making intentional misstatements of fact, and ignoring evidence that exculpated Hovatter and implicated other suspects. Hovatter alleges that Jacobs made numerous intentionally false, misleading, and inaccurate representations in the statement of probable cause that led to Hovatter being charged with the Payne murder.

On April 29, 1994, Widdowson charged Hovatter by a criminal information filed in Somerset County, Maryland with first degree murder, conspiracy to commit murder, and the use of a handgun in the commission of a crime. An arrest warrant was issued, and Hovatter was arrested by Jacobs on May 2, 1994. At Hovatter's initial appearance later that day and at a bail review hearing the following day, he was determined to be ineligible for pretrial release and was ordered held without bail.[1] Hovatter's initial trial on the Payne murder charges in September 1994 resulted in a hung jury. In his first retrial, in January 1995, he was convicted by a jury for first degree murder, but the Maryland Court of Special Appeals reversed the conviction in April 1996.  The state subsequently retried Hovatter in January 1998, June-July 1999, May 2000, and October 2000, and he was finally acquitted of all charges on October 26, 2000.  Hovatter remained in pretrial detention from the time of his arrest until May 2000, when Judge Frederick J. Price reduced his bond to $5,000.

Hovatter filed this lawsuit in October 2003 against the present defendants, as well as several others, under federal and state law.  After the defendants filed a motion to dismiss, the court issued

---

[1] Hovatter then waived his right under Md. Code Ann., Crim. Proc. § 4-103 to a preliminary hearing.

an order which granted that motion in part and denied it in part.  *See Hovatter v. Widdowson*, No. CCB-03-2904, 2004 WL 2075467, Order of Sept.16, 2004 ("*Hovatter I*").[2]

At this stage, Hovatter still brings a federal claim under 42 U.S.C. § 1983, claims under the Maryland Declaration of Rights,[3] and a state law claim for malicious prosecution, all against defendants Widdowson and Jacobs.[4]  With the close of discovery, defendants submitted a motion for summary judgment, which Hovatter opposed.  The court heard oral argument from both counsel on December 20, 2005.

II. Standard of review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

[2] Specifically, all claims against defendants Hunter Nelms, John Doe, and the Boards of Commissioners of Wicomico and Somerset Counties were dismissed. All state law claims against defendants Martin Fisher and Stephen Matthews also were dismissed.  The claims for false arrest, false imprisonment, intentional infliction of emotional distress, and civil conspiracy were dismissed as to Widdowson and Jacobs, and the claim for invasion of privacy false light was dismissed as to Jacobs.

[3] Although the amended complaint does not invoke Article 26, plaintiff stated in his opposition brief that he had intended to bring a claim under this provision as well, and that the defendants did not oppose any such amendment.  (Pl.'s Opp'n, at 1.)  The court will construe the defendants' motion as seeking summary judgment on the Article 26 claim as well.

[4] Hovatter has voluntarily dismissed his remaining claims against defendants Fisher and Matthews, and has abandoned his claim for invasion of privacy/false light claim against Widdowson.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to...the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

III. Analysis

A. The nature of plaintiff's § 1983 claim

In order to assess the evidence in this case properly, the precise nature of the plaintiff's § 1983 claim must be reexamined. In *Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996),

the Fourth Circuit held that the plaintiff stated a valid § 1983 claim under the Fourth Amendment by alleging that the police "seized him pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor," *id.* at 183-84, and noted that such a claim was most analogous to a common law tort for malicious prosecution. *Id.* at 182.[5]

In its earlier ruling in this case, the court stated that at least some of Hovatter's allegations – namely that "officials made false and misleading statements to support a finding of probable cause for this arrest warrant, testified falsely and procured the false testimony of others, and pursued a prosecution despite the lack of probable cause" – could establish a Fourth Amendment violation. *Hovatter I*, 2004 WL 2075467, at *4. Noting the limits of constitutional protections as to pre-trial detention, the court held that "Hovatter initially is limited to a § 1983 claim akin to malicious prosecution based on any alleged Fourth Amendment violations for the time period prior to May 2 and 3, 1994" (when he went before a magistrate). *Id.*

The focus of the plaintiff's Fourth Amendment theory is the Application for Statement of Charges prepared by Jacobs at the end of his investigation. (Pl.'s Opp'n, Ex. 6) [hereinafter "Application"]. There is no question that were everything in the Application accepted at face value, it would support probable cause to arrest and prosecute Hovatter. The plaintiff's contention, therefore, is that the Application is so tainted by intentional misrepresentations that, in fact, it could not have established probable cause. However, the Fourth Circuit has emphasized that even

---

[5] In *Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000), the Fourth Circuit clarified that:
> [T]here is no such thing as a '§ 1983 malicious prosecution' claim. What we termed a "malicious prosecution" claim in *Brooks* is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution...

*Id.* at 262.

deliberate falsehoods in a probable cause statement do not violate the Fourth Amendment unless they are necessary to the finding of probable cause. *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir. 1994). In *Wilkes*, Gloria Wilkes brought a § 1983 action under the Fourth Amendment against a South Carolina county and LeGrand Young, its Director of Buildings and Grounds, based on her arrest for failing to appear in court as required by a parking summons.  She alleged that Young made a false statement in the affidavit he prepared, which led a magistrate to issue a warrant for her arrest. *Id.* at 1364.  The court held that even assuming the jury found the statement in question to be false, Young committed no Fourth Amendment violation:

> It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *see, e.g., United States v. George*, 971 F.2d 1113, 1123 at n. 15 (4th Cir.1992). Here, probable cause for Wilkes' arrest plainly existed *even in the absence of Young's purported misrepresentation*; thus, even accepting Young's statement as a lie, it could not possibly have constituted a Fourth Amendment violation because the material falsely represented was altogether unnecessary to the magistrate's finding of probable cause.

*Id.* at 1365 (emphasis in original); *see also Simmons v. Poe*, 47 F.3d 1370, 1384-86 (4th Cir. 1995) (applying the *Franks* rule in a § 1983 action against a police officer, and holding that no violation occurred because the search warrant supported probable cause even disregarding the allegedly impermissible reference to race); *Freeland v. Childress*, 177 F.Supp.2d 422, 430 (D.Md. 2001).[6]

---

[6] Other circuit courts analyzing § 1983 claims against a police officer based on alleged fabrications in a probable cause statement have similarly utilized a *Franks* analysis, in other words, asking whether the document would support probable cause in the absence of any intentional misstatements.  *See, e.g., Hindman v. City of Paris*, 746 F.2d 1063, 1066-68 (5th Cir. 1984); *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985); *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990); *cf. Smith v. Reddy*, 101 F.3d 351, 355 (4th Cir. 1996) (applying an objective reasonableness standard, rather than the *Franks* test, in a qualified immunity context).

Therefore, a central question regarding the plaintiff's Fourth Amendment theory is whether the Application would validly support probable cause even if all the misrepresentations alleged by the plaintiff were redacted. *See U.S. v. Gillenwaters*, 890 F.2d 679, 681-82 (4th Cir. 1989) (upholding the district court's determination, after a *Franks* hearing, that probable cause existed based on "the totality of the circumstances presented in the untainted portion of the affidavit"); *U.S. v. Friedemann*, 210 F.3d 227, 229-30 (4th Cir. 2000).[7]

Because the plaintiff alleges that Jacobs and Widdowson acted deliberately in falsifying evidence and/or fabricating probable cause, however, his claim should also be viewed in light of *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005). In that case, Earl Washington, Jr., after being pardoned for a rape/murder, brought a § 1983 claim against Curtis Wilmore, a Virginia State Police investigator, based on Wilmore's false statement that Washington possessed nonpublic knowledge about the crime, which constituted crucial evidence against Washington throughout his criminal proceedings. *Id.* at 276-78. In affirming the denial of qualified immunity, the court framed the constitutional right at issue as "the right not to be deprived of liberty as a result of the fabrication

---

[7] When probable cause is challenged by a criminal defendant in a *Franks* suppression hearing, it is an issue for the court to resolve. *See, e.g., U.S. v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990); *Gillenwaters*, 890 F.2d at 682. However, in a civil § 1983 case, when a plaintiff challenges the sufficiency of a probable cause statement in light of intentional misrepresentations, the question is suitable for a jury. *See Hindman*, 746 F.2d at 1067 (5th Cir. 1984). Even so, the issue is still subject to judgment as a matter of law where there is "no legally sufficient evidentiary basis for a reasonable jury to find" that probable cause was lacking. Fed.R.Civ.P. 50(a); *see Wilkes*, 28 F.3d at 1365-66 (finding that probable cause existed as a matter of law, thereby reversing a jury verdict in a § 1983 action).

of evidence by a government officer acting in an investigating capacity." *Id.* at 282 (quoting *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000)).[8]

The *Wilmore* court emphasized, however, that causation is a crucial element of a § 1983 claim based on this right, and framed the issue in this way:

> The proper inquiry...is whether Washington's conviction was a reasonably foreseeable result of Wilmore's initial act of fabrication – the police report. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (recognizing applicability to § 1983 claims of the rule of tort liability "that makes a man responsible for the natural consequences of his actions"), *overruled on other grounds, Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695-701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial--none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

407 F.3d at 283. The court noted that discovery as to causation had not been conducted in the case, for example as to "whether Wilmore's false statement in the police report influenced the decision to bring charges against Washington and the manner in which the prosecution was conducted." *Id.* The court, however, referred to evidence presented at trial and appeared to put great weight on the fact that the fabricated evidence "has been important throughout the history of the case," from the

---

[8] The *Wilmore* court did not specify the precise constitutional source of this right, but in an unpublished *per curiam* decision, *White v. Wright*, 150 Fed.Appx. 193 (4th Cir. 2005), the court stated that the claim in *Wilmore* was rooted in substantive due process. *Id.* at 198. There is no reason to bar consideration of the implications of *Wilmore* on the nature of plaintiff's claim at this stage in the proceedings. The court's earlier decision in this case was issued prior to *Wilmore*; at the same time, the Fourth Circuit held that the enunciated right in that case was clearly established as of 1967. *Wilmore*, 407 F.3d at 283-84. In addition, to the extent the right in *Wilmore* is grounded in the Fourteenth Amendment, the plaintiff's amended complaint invoked that provision in addition to the Fourth Amendment, and the plaintiff relied on *Wilmore* in his opposition to the motion for summary judgment.

decision to prosecute, to the conviction, to the governor's decision not to pardon Washington. *Id.*
at 283.

The Second Circuit's decision in *Zahrey*, on which *Wilmore* relies heavily, addressed the
issue of causation in greater detail, and in particular the issue of whether the causal link between the
deliberately deceptive acts of a police officer and the claimant's injury can be broken by the
independent judgment of another decision-maker, such as a prosecutor or magistrate.  *See* 221 F.3d
at 349-55.  Ultimately, the Second Circuit concluded that even if the intervening decision-maker was
not misled or coerced, the initial wrongdoer should still be liable where he could "reasonably foresee
that his misconduct will contribute to an 'independent' decision that results in a deprivation of
liberty." *Id.* at 352.  This statement is followed, however, by a salient footnote, which reads:

> The initial wrongdoer might avoid liability where the intervening decision-maker
> would have precipitated the deprivation of liberty even in the absence of the
> antecedent misconduct; in that circumstance, "but for" causation could be claimed
> to be lacking.

*Id.* at 352 n.8.   Under the court's reading of *Wilmore* and *Zahrey*, the right enunciated in these cases
would not be violated, even where an investigative officer fabricates evidence, if that fabrication was
not the "cause" of the plaintiff's detention and conviction.

The court will now proceed to analyze the evidence presented in the case in light of this
understanding of the plaintiff's § 1983 claim.  Ultimately, the court concludes that the plaintiff
cannot establish such a claim under either the Fourth or the Fourteenth Amendment.


B. Widdowson

As an initial matter, the court finds that the plaintiff has not presented sufficient evidence to establish that Widdowson violated § 1983 under any theory.  As stated in the court's earlier opinion, Widdowson would not be entitled to absolute immunity for any actions taken pursuant to the investigative, as opposed to prosecutorial, aspects of Hovatter's case.  *Hovatter I*, 2004 WL 2075467, at *3 (citing cases).  Although the plaintiff has demonstrated Widdowson's substantial involvement in the investigative component of Hovatter's case, such involvement by a prosecutor is not necessarily unusual or overzealous, especially in a first degree murder case.  The plaintiff cannot, however, demonstrate that Widdowson intentionally fabricated any evidence, or induced Jacobs to do so.  For example, the plaintiff adverts to Jacobs' testimony that he and/or Widdowson "preferred charges against Mr. Hovatter and Mrs. Payne and Mr. Jenkins" (Trial Tr., *State v. Hovatter*, 99-0783C, May 2000, at 111) [hereinafter "May 2000 Trial Tr."].  In this context, "preferr[ing] charges" is often used as a term of art for bringing criminal charges; even under the plaintiff's reading, however, this statement would not actually suggest that Widdowson encouraged Jacobs to fabricate probable cause in order to bring those charges.

The plaintiff also points to the fact that Widdowson personally paid trial-related expenses for Greg Bell; however, the government openly revealed the payments at the beginning of Bell's testimony and Hovatter's counsel was free to cross-examine Bell on that basis.  (Trial Tr., *State v. Hovatter*, CR 4662, January 1995, at 290) [hereinafter "1995 Trial Tr."].  Furthermore, as discussed below, Brett Wilson, Hovatter's counsel for the 1994 trial, testified at the May 2000 trial as to statements made by Reese Hales ("Hales"), to the effect that Hales felt coerced into making statements against Hovatter, and that he was dissatisfied with Widdowson at that trial.  (Trial Tr.,

*State v. Hovatter*, No. 990783-C, Oct. 2000, at 155-56) [hereinafter "Oct. 2000 Trial Tr."].  This evidence, reflecting several layers of hearsay, is of dubious admissibility, and it does not even directly implicate Widdowson.

Plaintiff also submitted an affidavit by Archibald McFadden, counsel for his last two trials, who stated that after the May 2000 trial ended in a mistrial, he asked Widdowson how many times the state would retry Hovatter, and Widdowson replied "with something to the effect of, 'I'll have Hovatter doing life on the installment plan for all I care.'" (Affidavit of Archibald McFadden ¶ 6.) Although this statement might suggest that the prosecutor harbored some animus towards Hovatter, that does not mean that he crossed the line at any time by fabricating evidence or improperly pressuring witnesses.[9]

In sum, even viewed in a light most favorable to the plaintiff, the evidence does not demonstrate a genuine issue as to whether Widdowson intentionally violated the plaintiff's rights.[10]  Accordingly, the court will hereafter focus only on the question of whether the plaintiff can establish a claim against Jacobs.

C. Jacobs' Application for Statement of Charges

---

[9] In addition, Widdowson's decision to continue retrying Hovatter may have been a questionable exercise of prosecutorial discretion, even in a murder case, but it does not in itself establish a constitutional violation.

[10] Without evidence suggesting misconduct in the investigative aspect of the case by Widdowson, Hovatter cannot otherwise establish a § 1983 claim against Widdowson.  Even if Hovatter could prove that the state lacked probable cause, Widdowson would be entitled to absolute immunity for his decision to prosecute Hovatter.  *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).

At the culmination of his investigation in the Payne murder case, Jacobs completed the Application, which he presented to Widdowson prior to the latter's filing the criminal information. (*See* Pl.'s Opp'n, Ex.6.)  The plaintiff has argued that this document is replete with intentional misrepresentations, and the court finds that, at the very least, it contains numerous statements that are contradicted by other evidence in the record.  The court concludes, however, that even if it agrees with the plaintiff as to each of the deliberate misrepresentations alleged, the document nonetheless supports probable cause with the suspect material redacted.  To explain this conclusion, the court will examine those portions of the Application that the plaintiff challenges, and then will assess the information that remains once the questionable elements have been excised.

First, however, the court will address the defendants' contention that because the Application was never actually signed or filed, it is irrelevant to the issue of probable cause.  *See Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980) ("[W]e do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."); *Zahrey*, 221 F.3d at 348 (quoting same); *White*, 150 Fed.Appx. at 199 (quoting same).  Jacobs stated in his deposition that he completed the Application with the intention that it would be the vehicle by which Hovatter was charged, and he submitted it to Widdowson for his review prior to the filing of the criminal information against Hovatter.  (Deposition of George Jacobs, at 150-51; *see also* Police report of George Jacobs, Mar. 28, 1994.)  In addition, a pre-printed return of service on the arrest warrant, signed by Jacobs, indicates that he "delivered a copy of the Statement of Charges to the Defendant."  (Defs.' Mot., Ex. 2, at 20.)  Thus, there is evidence that this document was relevant, if not instrumental, in the decision to arrest and prosecute Hovatter.

On the other hand, the court considers the fact that it was not the actual charging document potentially significant in two ways.  First, Widdowson might have in fact questioned the veracity of certain portions of the Application, and second, it might not have contained all of the evidence on which Widdowson based his decision to prosecute.[11]

Turning to the content of the Application, the plaintiff first takes issue with its statement that "[w]itnesses observed a blue 73 Ford pickup truck leaving the driveway of the Payne residence immediately after the shooting."  (Application, at 1.)  The plaintiff points to several police reports, trial testimony, and Jacobs' answers to interrogatories to undermine the veracity of this statement. While several witnesses observed a vehicle near the time and place of the shooting, no single witness ever described the truck in question with the specificity of the Application.  (*See, e.g.,* 1995 Trial Tr., at 147, 151 (Mike Ake), 160-61 (Robert Lloyd), 165-67 (Cynthia Lloyd).) More importantly, no witness described the truck as leaving the driveway of the Payne residence immediately after the shooting.[12]  This sentence in the Application is particularly significant due to another statement that the "[i]nvestigation has revealed that Walt Hovatter had owned a '73 pickup truck, dark blue in color matching the description of the vehicle seen leaving the Payne residence immediately after the shooting." (Application, at 6.)  The blue truck was the only purported evidence connecting Hovatter to the scene of the crime, in the absence of any other physical evidence that did so. (Jacobs Dep.,

---

[11] Unfortunately, Widdowson has not been available for deposition for medical reasons.  He has submitted a conclusory affidavit denying the plaintiff's factual allegations, which must be disregarded in the absence of any opportunity for cross-examination.  The plaintiff's motion to strike this affidavit will be granted.

[12] In his deposition, Jacobs admitted that no witness had told him a vehicle was seen leaving the Payne residence; at most he was told that the vehicle was on Cherree Lane, in the area of the Payne residence.  (Jacobs Dep., at 289-90.)

at 99.)  The plaintiff disputes whether he even owned such a truck; although there was evidence that

he sold his brother Donald Hovatter a blue Ford truck (Police report of George Jacobs, Mar. 28,

1994), counsel contended at oral argument that it was inoperable at the time of the murder.  In

addition, the Application fails to mention a police report stating that the "vehicle in question was

found to belong to Warren Thomas Miller," a neighbor of the Paynes who was never suspected in

the murder. (Police report of Darin Fisher, Mar. 24, 1990.)[13]

The plaintiff next points to another key piece of evidence in the Application, regarding an

exchange of money between Hovatter and Jenkins some time after the date of the murder.  Jacobs'

account of this transaction in the Application differs significantly from the later trial testimony of

two witnesses to this exchange, LeAnn Boykin ("Boykin"), who worked for Jenkins at the time, and

her sister Carol Gordy ("Gordy").  For example, the Application describes two separate occasions

on which Jenkins gave Hovatter money at his office (Application, at 2-3.), whereas Gordy and

Boykin both testified as remembering only one such occasion (1995 Trial Tr., at 312-14 (Gordy),

399 (Boykin).)  In addition, the Application states that the day after $9,650 was stolen from the

Paynes' home, Jenkins was seen in his office with a large amount of cash not accounted for through

his business dealings, that his first transaction with Hovatter occurred that same day, and that he

personally gave Hovatter a quantity of cash.  (Application, at 2.)  According to Gordy and Boykin,

Jenkins gave Boykin a sealed envelope for Hovatter to pick up, the money might have been related

to a business transaction, and neither could remember on what date the exchange occurred.  (1995

---

[13] Although, in general, a statement of probable cause does not contain a material falsehood
merely due to an omission of exculpatory information, *see Colkley*, 899 F.2d at 301, a court can
consider whether the officer disregarded "readily available exculpatory evidence."  *Torchinsky v.
Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991).

Trial Tr., at 312-16 (Gordy), 339-40 (Boykin); May 2000 Trial Tr., at 142, 145-46.)[14]  Although Gordy and Boykin did witness a transaction between Hovatter and Jenkins, the Application portrays the incident in a more incriminating light.

Another significant passage in the Application regards Hovatter's July 1993 criminal trial for harassing Debbie Payne over the telephone, at the end of which he was acquitted.  (*See* Pl.'s Opp'n, Ex. 16, at 87.)  The Application states that "while under oath, Debbie Payne accused Walter Hovatter of murdering her husband." (Application, at 5.)  Jacobs repeated this observation initially during his deposition; it was only after reviewing the transcript of the telephone harassment trial that Jacobs acknowledged that Debbie only indicated that Walter was a suspect in the murder investigation, and that his earlier statements to the contrary were incorrect.  (Jacobs Dep., at 153-54.)

The Application also contains summaries of incriminating statements by three past employees of Hovatter.  Although none of the three are identified by name, plaintiff's counsel suggested that Reese Hales was the first employee described in the Application, based on a

---

[14] In addition, the Application states that Gordy, Boykin, and another boarder at Jenkins' residence, "had several occasions to witness Kirk, Debbie, and Walt together" prior to the murder, and that Boykin and Gordy "had regular contact with Kirk, Debbie a[n]d Walt for a month or two period around the murder." (Application, at 8-9.)  However, Debbie testified, both at a 1993 telephone harassment trial against Hovatter and at the 1995 murder trial, that she had never personally met Hovatter prior to 1993.  (Pl.'s Opp'n, Ex. 16, at 10; 1995 Trial Tr., at 406.)  Similarly, while Gordy and Boykin testified to seeing Jenkins and Hovatter together, and Jenkins and Debbie together, they never indicated that they saw the three together.  The Application thus makes an incriminating, but misleading, suggestion that the three were seen together around the time of the murder.  Although the plaintiff does not challenge these statements, the court will disregard them in its probable cause analysis.

comparison with his testimony elsewhere.[15]  Although Hales testified at the 1994 trial, he refused

to testify at the 1995 trial, for which he was held in contempt of court.  Hovatter has produced a trial

transcript for the October 2000 trial, in which Brett Wilson, Hovatter's counsel for the January 1995

trial, testified about a meeting he had with Hales in March 1995 at the latter's initiation:

> Hales told me that he had been coerced into being a witness against Mr. Hovatter;
> that he had been coerced into making statements against Mr. Hovatter, and that he
> had been coerced into testifying about those statements, that he felt his statements
> were misrepresented...He indicated that he had been given a written script to follow
> in this case to testify; and he indicated that he was dissatisfied with Mr. Widdowson
> in the case.

(Oct. 2000 Trial Tr., at 155-56.)  The delineation Hales made between "making statements" and

"testifying about those statements," suggests that the former refers to statements Hales made during

the investigation.  Although, as noted, the court has serious doubts as to the admissibility of this

testimony, the court will assume, for the purposes of this opinion, that the account of Hales'

statements in the Application is wholly tainted.

Having examined the major statements the plaintiff challenges in the Application, the court

will turn to the question of whether it supports probable cause in the absence of these statements.

First, the plaintiff does not challenge the Application's initial discussions of Debbie's motive against

her husband, the theft of $9,650 from the Payne residence shortly before the murder, and the

extensive interactions between Debbie and Jenkins; this evidence lays the foundation for the theory

---

[15] Based on a comparison between the Application and their testimony at the 1995 trial,
Nathaniel White and Greg Tingle appear to be the second and third unnamed formed employees,
respectively.

that Debbie and Jenkins conspired to hire a third party to murder Payne.  The Application then

describes Hovatter's communications with Debbie in 1993 where he demanded $3,700 from her, and

notes that "[b]y this time, Debbie was aware that it was Walt Hovatter whom Kirk Jenkins had hired

to kill Charlie." (Application, at 5.)[16]  Although the court disregards Debbie's direct accusation

against Hovatter during the telephone harassment trial, her other uncontroverted statements still cast

Hovatter in a suspicious light.  The Application also relates Hovatter's testimony at that trial, namely

that he had been unsuccessful in recovering money he loaned – without any paperwork – to Jenkins,

who told him to get the money from Debbie.  The Application notes that, in an interview, Jenkins

stated that he had never borrowed money from Hovatter.  (*See* Police Report of George Jacobs, Oct.

14, 1993.)  The Application suggests that it was because of this trial that Hovatter became the focus

of the Payne investigation.

In addition, even disregarding Reese Hales' statements in their entirety, the Application also

relates statements by two other former employees of Hovatter, Nathaniel White ("White") and Greg

Tingle ("Tingle").  White stated that, while working for Hovatter during the year after the murder,

Hovatter told him that he had killed a weightlifter a short time prior.[17]  The Application relates two

---

[16] The Application also says that Hovatter told Debbie that "if she did not pay up, she would end
up like Charlie." (Application, at 5.)  During the 1995 trial, however, Debbie testified that
Hovatter did not actually state that the money he sought had any connection with the death of her
husband, which the Application seems to imply.  (1995 Trial Tr., at 406.)  The court has
disregarded this particular statement in the Application.

[17] At the 1995 trial, White stated that Hovatter told him he had killed a "musclebound guy."
(1995 Trial Tr., at 258.)  Based on its context, "musclebound" appears to have been an
appropriate description of Payne, a fact which neither party challenges.  On the other hand,
according to the Application, Hovatter indicated to White that the person he killed lived in

key statements by Tingle: first, that Hovatter had confided in him that he had been paid to kill Payne

for Jenkins and Debbie, and second, that Hovatter described how Jenkins had driven him to Payne's

house so that Hovatter could shoot Payne. (Application, at 8.)  Testifying at the 1995 trial, Tingle

indicated that Hovatter never actually said Payne's name, but that Tingle had surmised he was the

victim from "little things that were said."  (1995 Trial Tr., at 335.) He also indicated that Hovatter

told him the shooting "was over Kirk Jenkins."  (*Id.* at 329.)   In light of this testimony, the court

will disregard the second statement, but will consider Tingle's statement that Hovatter told him that

he had killed Payne for Jenkins.

Finally, although the court disregards the Application's statement that Boykin, Gordy, and

another woman actually saw Debbie, Jenkins, and Hovatter all together several times prior to the

murder, the document nonetheless states that the three women were "very sure that something

terrible was being planned," and after the murder "it was obvious to them that Debbie and Kirk hired

Walt to kill Charlie." (Application, at 8-9.)

In sum, the connection drawn between Debbie's and Jenkins' discussions about hiring

someone to kill Payne and Hovatter's subsequent demands for money from the two constitutes the

core evidence implicating Hovatter, which is further supported by the statements by Tingle, White,

---

Princess Anne (Application, at 7), whereas White testified in 1995 that, at most, Hovatter
indicated that the person he killed was in Somerset County.  (1995 Trial Tr., at 257-59, 263-64.)
(Princess Anne is located in Somerset County.)  This is one of numerous examples in which the
Application appears to recast information that is already damaging to Hovatter in an even more
incriminating light. This factor has largely contributed to the unique and challenging nature of
this case. Nonetheless, although the court disregards the precise information that appears to be
incorrect or misleading, it considers the surrounding information in its analysis.

Boykin, and Gordy. Based on this analysis, the court finds that, even viewing the Application with the considerable quantity of suspect material redacted, no reasonable jury could find that it did not support probable cause to arrest and prosecute Hovatter based on the "totality of the circumstances." *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Wilkes*, 28 F.3d at 1365 ("Probable cause only requires enough evidence 'to warrant a man of reasonable cause in the belief that an offense has been or is being committed.'") (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). Accordingly, the court concludes that even if the plaintiff could prove that Jacobs intentionally misrepresented some of the evidence in the Application, he cannot establish that Jacobs violated his Fourth Amendment rights.

D. <u>1995 trial testimony</u>

In addition to the Application, the court has taken account of the significant incriminating evidence presented at the 1995 trial, some of which was not mentioned in the Application and some of which appeared there in a different form.[18] For example, Boykin and Gordy testified that Jenkins

---

[18] The defendants have urged the court to apply the rule, as applied in *Zablonsky v. Perkins*, 187 A.2d 314 (Md. 1963) and numerous other cases, providing that the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively or presumptively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means. *Id.* at 316 (citing RESTATEMENT OF TORTS § 667); *see also* 86 A.L.R.2d 1090 (listing cases). Defendants argue that because Hovatter was convicted in the 1995 trial – even though the conviction was overturned on appeal – and he cannot establish fraud at the trial, the state possessed probable cause as a matter of law. As an initial matter, some federal courts have questioned the rule's applicability in § 1983 cases. *See Montgomery v. De Simone, PTL*, 159 F.3d 120, 125 (3d Cir. 1998) (holding that "the Restatement's rule that an overturned municipal conviction presumptively establish [*sic*] probable cause contravenes the policies underlying the Civil Rights Act and therefore does not apply to a section 1983 malicious

gave Boykin an envelope containing an unknown amount of cash, which she gave to Hovatter at Jenkins' business.  (1995 Trial Tr., at 312-14, 339-40.)  White testified that Hovatter asked him whether he had heard of a murder in Somerset County, and told White that he had killed someone once for money.  (*Id.* at 256-60.)  As discussed, Tingle testified that Hovatter admitted shooting someone "over Kirk Jenkins," and that he inferred that Payne was the victim from "just little things that were said" by Hovatter.  (*Id.* at 328-29, 335.)  Hovatter's brother Donald testified that during a conversation in May 1994, he asked Walter whether he had murdered Payne, to which Walter replied "with a sarcastic attitude" that he had done so. (*Id.* at 231.)  Greg Bell, a cellmate of Hovatter's during pre-trial detention, testified that Hovatter confessed to the murder, giving him a very detailed account of the act that even included picking up the envelope of cash from Boykin. (*Id.* at 293-96.)  Finally, Debbie Payne testified at length as to her discussions with Jenkins regarding her husband's death, the theft of the $9,650 from their home, and Jenkins' initial efforts to get money from her for the hired killer.  (*Id.* at 375-97.)  She further testified that in 1993, Hovatter began seeking $3,700 from her, claiming that it was owed to him by Jenkins.  (*Id.* at 398-401.)  She

---

prosecution action"); *Meehan v. Town of Plymouth*, 167 F.3d 85, 91 (1st Cir. 1999) (expressing doubt as to whether the rule applies but declining to decide the issue); *Gray v. Maryland*, 2004 WL 2191705, at *7 (D.Md., Sept. 24, 2004) (Blake J.) (citing the Third Circuit's decision in *Montgomery*); *cf. Cramer v. Crutchfield*, 648 F.2d 943, 945 (4th Cir. 1981) (applying the rule as a matter of Virginia law); *Asuncion v. City of Gaithersburg*, 73 F.3d 356, 1996 WL 1842, at *2 (4th Cir.1996) (unpublished table disposition) (applying the rule as a matter of Maryland law). Given its present holding, the court sees no need to determine the rule's application in this case. Nonetheless, one rationale supporting the rule is that the evidence eventually presented by the prosecution at trial relates back to the sufficiency of its initial probable cause determination. Accordingly, the evidence presented at the 1995 trial could be relevant to the ultimate issue of whether the state possessed probable cause to prosecute Hovatter.  *See Meehan*, 167 F.3d at 91-92.

then related how she sought the help of Hales, an associate of Hovatter, in order to locate Hovatter;

Hales took her to a carnival where Jenkins was also present, and she witnessed a tense interaction

between Hovatter and Jenkins.  (*Id.* at 402-04.)[19]

    This body of evidence, at the very least, significantly distinguishes the facts of this case from

those in the *Wilmore* case.   As discussed above, Wilmore's alleged initial fabrication as to

Washington's nonpublic knowledge was a crucial piece of evidence that was repeated throughout

the course of Washington's criminal proceedings. 407 F.3d at 283.  Here, it cannot be said that any

misstatements in the Application were repeated as such at trial; the witnesses testified in their own

words and often in ways that differed from their statements in the Application.  Jacobs himself only

testified briefly at the 1995 trial, and did not recount the information presented in the Application.[20]

The 1995 testimony thus negates the inference of a causal link between the false Application and

the continued detention and trials of Hovatter, given that Widdowson did not rely on the Application

in his presentation of evidence to the juries; moreover, this evidence undoubtedly demonstrates that

---

[19] Deputy Martin Fisher also testified that he saw a meeting between Jenkins and Hovatter at the carnival, in order to corroborate Debbie's testimony.  (*Id.* at 428-37.) The trial court prevented the defense from asking Fisher about his termination from a police department, which became the basis for the Court of Special Appeals' reversal of the conviction. *See Hovatter v. State*, Maryland Court of Special Appeals, Slip. Op. No. 695/1995.

[20] The plaintiff alleges that Jacobs lied when he testified in 1995 that there were only two working theories – one that Debbie hired someone to kill her husband, and the other that Payne never paid off a debt and the killer got tired of waiting – and that the second theory was abandoned because "there was no information gained."  (1995 Trial Tr., at 442.)  Although the plaintiff correctly points out that there were numerous suspects in the investigation when Jacobs took over the case, Jacobs' characterization of the investigation was elicited during cross-examination, not offered as proof by the state, and Hovatter's counsel could have further challenged Jacobs on this point.  In any event, Jacobs cannot be held liable for his testimony at trial.  *Wilmore*, 407 F.3d at 283 (citing *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983)).

the state had probable cause.[21]  Accordingly, the court concludes that the plaintiff cannot prove that his deprivation of liberty came about "as a result" of any falsifications by Jacobs, and thus cannot establish that Jacobs committed a violation of the right enunciated in *Wilmore* and *Zahrey*.

E. Other claims

A lack of probable cause is an essential element for a malicious prosecution claim under Maryland law.  *Montgomery Ward v. Wilson*, 664 A.2d 916, 922 (Md. 1995).  Because, as the above discussion makes clear, the plaintiff cannot establish a lack of probable cause, his state law malicious prosecution claim must fail as well.  *Cf. Zablonsky*, 187 A.2d at 316 (adopting as Maryland law the rule that a conviction, even if overturned on appeal, is conclusive proof of probable cause, unless the conviction was obtained through fraud, perjury, or other corrupt means).

As stated in the court's earlier opinion, the Maryland Court of Appeals has directed that Articles 24 & 26 of the Maryland Declaration of Rights be construed *in pari materia* with their federal counterparts.  *Hovatter I*, 2004 WL 2075467, at *8 (citing *Carter v. State*, 788 A.2d 646, 652 (Md. 2002) and *Pickett v. Sears, Roebuck & Co.*, 775 A.2d 1218, 1224 (Md. 2001)).  Thus, the court's holding as to Hovatter's § 1983 claim applies equally to his claims under Articles 24 & 26.

_____

[21] The causal link also was attenuated by Widdowson's decision to use an information, rather than the Application, as the charging document holding Hovatter in custody.  Hovatter could have sought a preliminary hearing to challenge the probable cause for his detention, but did not do so.

The court's conclusions also obviate the need to rule on the defendants' claims for qualified immunity under federal law and/or for state law-based immunity.  Likewise, the court need not consider whether the plaintiff could have sought punitive damages in this action.


IV. Conclusion

This case has presented the court with a constellation of challenging circumstances, both factually and legally.  Charles Payne was killed in his own home and, as far as the court can tell, no one has been convicted of the crime.  Over the course of six years, the plaintiff endured six trials for first-degree murder and was eventually acquitted.  He spent almost that entire time in pre-trial detention, where he undoubtedly suffered many deprivations.  There is considerable evidence to suggest that Jacobs prepared his probable cause statement in a reckless, if not intentionally misleading, manner. The applicable law is at times opaque and the focus of the legal theories has shifted during the pendency of this lawsuit.  Nonetheless, the court must ultimately conclude that the state possessed probable cause to prosecute Hovatter, and that Hovatter's continued detention was not the "result" of any false statements by Jacobs.  Accordingly, the defendants are entitled to judgment as a matter of law.

A separate Order follows.


    March 29, 2006                              /s/                          
         Date                              Catherine C. Blake
                                           United State District Judge